Thomas ALGIE, Vincent Ingoglia, Eugene Stanley, James Patrick, Wallace Carnegie, Carl Reddo, Stephen G. Safka, Jr., Joseph A. Coppola, George Eccleston, Edward Edelson, John H. Sharp, Henrietta Greco, George Tropiano, Anthony Amelio, William Crouch, Joseph Fezza, Joseph Gleitman, Jack Gold, Calvin Gum, Pedro Richards, Aristedes Zagorianos, Mark Stein, and Dean Heunisches, Plaintiffs–Appellees,

v.

RCA GLOBAL COMMUNICATIONS, INC., and MCI International, Inc., Defendants–Appellants.

No. 1706, Docket 94–9318.

United States Court of Appeals, Second Circuit.

Argued June 1, 1995.

Decided July 12, 1995.

---

Christine H. Perdue, Fairfax, VA (Charles F. Martel, Joseph J. Saltarelli, Hunton & Williams, New York City, and Fairfax, VA; Anthony V. Alfano, MCI Communications Corp., Washington, DC, on the brief), for defendants-appellants.

John C. Lankenau, New York City (Sharon L. Schneier, Lankenau, Kovner & Kurtz, New York City, on the brief), for plaintiffs-appellees.

Before NEWMAN, Chief Judge, LUMBARD and McLAUGHLIN, Circuit Judges.

JON O. NEWMAN, Chief Judge:

The primary issue on this appeal is whether a severance benefits plan was terminated by the corporation that sponsored the plan for the benefit of its employees. In an action by discharged employees of the sponsor corporation to recover benefits under the plan, pursuant to the Employees Retirement Income Security Act of 1974 (ERISA) § 502(a)(1)(B), the District Court for the Southern District of New York (Michael H. Dolinger, Magistrate Judge) determined that the plan had never been terminated. Defendants appeal from the final judgment entered on December 21, 1994, awarding plaintiffs benefits under the plan, prejudgment interest, and attorney's fees. We affirm.

### Facts

This case arose in the context of the sale by General Electric Co. ("GE") of its subsidiary RCA Global Communications, Inc. ("RCAG") to MCI Communications, Inc. ("MCIC"), effective May 16, 1988. After the sale was complete, RCAG retained its identity as a corporation, all of whose stock was indirectly owned by MCI International, Inc. ("MCII"), which was in turn owned by MCIC.

Prior to the sale, RCAG maintained a Severance Allowance Plan for Non–Represented Salaried Employees (the "RCAG Plan"). Under the RCAG Plan, a covered employee who was laid off would receive a lump-sum severance benefit based on the employee's salary and length of service with the company. The maximum severance benefit was equal to 52 weeks of the employee's base salary. Plan documents unambiguously identified RCAG itself as the plan administrator, and provided that "[t]he Plan Administrator may terminate, suspend, withdraw, amend or modify the Plan in whole or in part at any time."[1]

Before RCAG was sold to MCIC, RCAG employees were covered by several benefit plans in addition to the RCAG Plan. Unlike the RCAG Plan, however, these other benefit plans were sponsored not by RCAG itself, but by the RCA Corporation, another subsidiary of GE that was not sold to MCIC. Pursuant to the Stock Purchase Agreement between GE and MCIC, RCAG was required to terminate the application of RCA Corporation-sponsored benefit plans to its employees effective at the closing of the sale, and the RCAG Board of Directors accordingly approved a resolution withdrawing from participation in such plans. However, the Stock Purchase Agreement provided for no similar termination of employee benefit plans sponsored and administered by RCAG itself, as opposed to the RCA Corporation, and neither the Board nor any officer of RCAG took any action to terminate the RCAG Plan prior to the effective date of the sale.

The sale of RCAG could not close until the Federal Communications Commission ("FCC") gave its approval, and FCC rules and antitrust considerations precluded MCIC or its subsidiaries from exercising any management control over RCAG, its employees, or its benefit plans prior to the closing. MCIC nonetheless prepared for the purchase of RCAG by adopting a new severance plan of its own, the MCI Communications Corporation Severance Pay Plan (the "MCI Plan"), which went into effect on February 1, 1988, several months before the closing. The MCI Plan capped severance benefits at 30 weeks of an employee's base salary, rather than the 52–week maximum allowed by the RCAG Plan. By its express terms, the MCI Plan covered employees of MCIC itself "and any of its subsidiary or affiliated corporations that have adopted the Plan with the approval of the Company [i.e., of MCIC]." Thus, by its own terms, the MCI Plan did not cover any subsidiary until the subsidiary itself adopted the Plan and MCIC approved the adoption. At the time MCIC promulgated the MCI Plan, its president signed a "Consent" for MCII and two other subsidiaries— but not RCAG—to adopt the Plan.

Before the closing of the RCAG sale, personnel representatives from both MCII's and RCAG's human resources departments met with RCAG's non-union employees to explain the benefits packages that would be provided by MCI upon completion of the sale. The parties dispute whether the MCI Plan was described at these meetings. It is undisputed, however, that no written documentation for the MCI Plan was provided.

After FCC approval was received, the sale of RCAG closed on May 16, 1988. Immediately thereafter, MCI sent out two kinds of letters to RCAG non-union employees: welcome letters assigning an employee to a new position in MCII, or termination letters informing an employee that he or she would be discharged effective May 30. The plaintiffs all received the latter type of letter. The discharged employees were given severance

---

1. An alternative version of the amendment clause was substantially identical: "RCAG Globcom [i.e., RCAG] may amend or terminate this Policy at any time, but no such amendment or termination will affect the severance allowances granted up to the effective date of such amendment or termination."

benefits under the MCI Plan, *i.e.,* capped at 30 rather than 52 weeks of their base salaries.

Several weeks later, on June 28, 1988, MCIC's president executed a Consent (the "June 28 Consent") *authorizing* RCAG to adopt the MCI Plan, retroactive to the date of the sale. The June 28 Consent read in relevant part: "[RCAG] is hereby authorized to adopt the [MCI Plan] as of May 16, 1988, and shall participate in the Plan with respect to all of its employees who are eligible to participate in accordance with the terms of the Plan." However, RCAG itself never took any action to adopt the MCI Plan.

Finally, in November 1988, several of the plaintiffs wrote a letter addressed to "Administrator, RCAG Plan" requesting additional severance benefits in accordance with the terms of the RCAG Plan. In response to this and subsequent inquiries, MCII executives replied that the RCAG Plan had terminated on the effective date of the sale, so that at the time the plaintiffs were discharged, they were covered by the MCI Plan, not the RCAG Plan.

*District Court Proceedings.* The plaintiffs subsequently commenced this action in the District Court alleging several causes of action under state law and ERISA and naming RCAG and MCII as defendants. By joint motion of the parties, the case was transferred to a magistrate judge for all purposes, pursuant to 28 U.S.C. § 636(c)(1) (1988), and was assigned to Magistrate Judge Dolinger. All but one of plaintiffs' claims were eventually dismissed; plaintiffs do not challenge any of these dismissals on appeal. The sole surviving count was a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (1988), for denial of benefits due to plaintiffs under the RCAG Plan.

On cross-motions for summary judgment, the District Court granted partial summary judgment to plaintiffs on their allegation that RCAG had never terminated the RCAG Plan. Magistrate Judge Dolinger recognized that unfunded severance benefit plans are not subject to ERISA's detailed vesting and accrual rules governing pension plans, and

that in principle the RCAG Plan could have been terminated unilaterally by RCAG. On two independent bases, however, the Magistrate Judge concluded that RCAG had never exercised its power to terminate. First, in reliance on *Schoonejongen v. Curtiss–Wright Corp.,* 18 F.3d 1034 (3d Cir.1994), which has since been reversed by the Supreme Court, —— U.S. ——, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), he concluded that the amendment and termination procedures provided for in RCAG Plan documents were not specific enough to comply with ERISA § 402(b)(3), 29 U.S.C. § 1102(b)(3) (1988), which requires employee benefit plans to specify a procedure for amending the plan and for identifying persons with authority to amend the plan. Second, the Magistrate Judge found that even if the RCAG Plan's amendment procedure were sufficiently precise, defendants had proffered "no evidence to demonstrate that RCAG, through its Board of Directors or by any other means, subsequently acted to terminate" the RCAG Plan. 891 F.Supp. 839, 862 (S.D.N.Y.1994).

The Magistrate Judge also determined that there was a genuine dispute with respect to plaintiffs' employment status at the time of their discharges. He therefore ordered a jury trial on the question of whether plaintiffs were still employed by RCAG, rather than MCII, at the time they received their termination letters and, if not, whether on the facts of this case their transfer to MCII-employee status represented a lay-off from RCAG on the date of the sale, thereby triggering benefits under the RCAG Plan.[2] The jury returned a special verdict finding that plaintiffs were still RCAG employees at the time they were discharged, several days after RCAG was sold to MCIC.

After the jury had returned its special verdict, defendants moved for judgment as a matter of law. They argued that certain evidence presented for the first time at trial—including the June 28 Consent, which had not been submitted to the court before it ruled on the parties' summary judgment motions—showed that the RCAG Plan had been

---

**2.** The Magistrate Judge overruled defendants' motion to strike plaintiffs' request for a jury trial. On appeal, defendants waive any challenge to the decision to allow a jury trial.

terminated, effective before the plaintiffs' discharges. The Magistrate Judge denied this motion for two reasons. First, he concluded that defendants were procedurally barred from relying on new evidence that had been uniquely within their control from the beginning of the litigation. Alternatively, the Magistrate Judge found that the new evidence, even if considered, did not establish that the June 28 Consent was effective to terminate the RCAG Plan, at least as to these plaintiffs.

Defendants also argued in their post-trial motions that the RCAG Plan Administrator's denial of benefits was subject to deferential review under the arbitrary and capricious standard. The Magistrate Judge rejected this argument on the basis of the language of the RCAG Plan. Finally, the Magistrate Judge granted plaintiffs' motion for attorney's fees and prejudgment interest.

### Discussion

Defendants argue that the District Court erred insofar as it ruled that the RCAG Plan had never been terminated and that deference was not due to the plan administrator on this issue. Defendants also contend that the District Court abused its discretion in awarding attorney's fees and prejudgment interest.

█ We affirm on the basis of the comprehensive and carefully reasoned opinions of Magistrate Judge Dolinger, 891 F.Supp. 839 (S.D.N.Y.1994) (motions for summary judgment), and 891 F.Supp. 875 (S.D.N.Y.1994) (post-trial motions), and adopt their reasoning with respect to each of the issues raised on appeal. Clarification is required only on the issue of whether the RCAG Plan was ever terminated. In granting summary judgment to plaintiffs on this question, the Magistrate Judge relied on two alternative theories. The first was that the RCAG Plan's amendment provision, allowing amendment or termination by RCAG, was invalid because it did not adequately specify the persons who were authorized to amend the plan and therefore did not satisfy the requirements of ERISA § 402(b)(3). This ba-

sis for the summary judgment ruling does not survive the Supreme Court's subsequent decision in *Curtiss–Wright Corp. v. Schoonejongen*, —— U.S. ——, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), *rev'g* 18 F.3d 1034 (3d Cir.1994), which reversed the Third Circuit decision on which the Magistrate Judge relied and held that the requirements of section 402(b)(3) are satisfied by an amendment provision specifying that "the Company" may amend the plan.

█ We affirm on the basis of the Magistrate Judge's alternative theory: that there was no evidence "that RCAG, through its Board of Directors or by any other means, [ever] acted to terminate" the RCAG Plan. 891 F.Supp. at 861. In *Schoonejongen*, the Supreme Court held that when a plan reserves amendment power to "the Company," "one must look *only* to '[t]he Company' and *not* to any other person" as the entity authorized to amend the plan. —— U.S. at ——, 115 S.Ct. at 1228. Further, "principles of corporate law provide a ready-made set of rules for determining, in whatever context, who has authority to make decisions on behalf of a company." *Id.* at ——, 115 S.Ct. at 1229; *see also id.* at ——, 115 S.Ct. at 1231. It is also well-established that any plan amendment must be in writing to be effective. *See Biggers v. Wittek Industries, Inc.*, 4 F.3d 291, 294–96 (4th Cir.1993); *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 32–33 (1st Cir.1991); *Frank v. Colt Industries, Inc.*, 910 F.2d 90, 98 (3d Cir.1990); *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 492 (2d Cir.1988); ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) (1988); *see also Schoonejongen*, —— U.S. at ——, 115 S.Ct. at 1231 (currently operative governing plan documents "necessarily include[ ] any new, bona fide amendments"). The Magistrate Judge correctly applied these principles to the facts of this case and found that there was no evidence that termination of the RCAG Plan was ever approved in writing by anyone who, under principles of corporate law, possessed authority to act in this matter on behalf of RCAG.[3]

---

**3.** Because we agree with the Magistrate Judge that, by its own terms, the June 28 Consent

neither adopted the MCI Plan for RCAG nor terminated the RCAG Plan, *see* 891 F.Supp. at

Finally, we reject appellants' argument that the sale of a corporation such as RCAG automatically results in the termination of benefit plans sponsored by that corporation. The cases in which appellants purport to find support for this proposition, *Bradwell v. GAF Corp.*, 954 F.2d 798 (2d Cir.1992), and *Sejman v. Warner–Lambert Co.*, 889 F.2d 1346 (4th Cir.1989), *cert. denied*, 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990), are distinguishable from the case at bar. *Bradwell* and *Sejman* both concerned sales of operating units as going concerns to new parent corporations. After the sales, employees of the sold operating units became employees of the new parent corporations. On these facts, the sale of the operating unit for which the employees worked ended their coverage under severance benefit plans sponsored by the old parent corporations, *i.e.*, by the employees' *former* employers. *See Bradwell*, 954 F.2d at 801; *Sejman*, 889 F.2d at 1348. The present case is distinguishable in two crucial respects. First, the RCAG plan was not sponsored by the old parent corporation, but by the sold unit, RCAG, which had its own corporate identity. Second, the jury specifically found that the plaintiffs in this case were still employed by RCAG, not its new parent MCII, at the time they were discharged. Thus, in contrast to *Bradwell* and *Sejman*, at the time plaintiffs in this case were discharged they were still employed by the corporation that sponsored the plan for the benefit of its employees.

The judgment of the District Court is affirmed.

884, it is unnecessary for us to consider the Magistrate Judge's alternative holding, that the defendants were procedurally barred from relying on this new evidence, *id.* at 881–82, and we express no opinion as to the correctness of that procedural ruling.