Michael LA FATA, et al., Plaintiffs,

v.

**RAYTHEON COMPANY,**
et al., Defendants.

No. 01 CV 1220.

United States District Court,
E.D. Pennsylvania.

Aug. 27, 2002.

Robert S. Kitchenoff, David H. Weinstein, Weinstein Kitchenoff Scarlato & Goldman, Ltd., Philadelphia, PA, Bryan R. Lentz, Bacheltor & Lentz, Philadelphia, PA, Edward F. Kalman, Philadelphia, PA, for plaintiffs.

Steven K. Ludwig, Fox, Rothschild O'Brien & Frankel, Philadelphia, PA, Richard J. Antonelli, James M. Wilson, Littlker, mendelsohn, Pittsburgh, PA, Gregory C. Broden, H. Douglas Hanson, Michael G. Monnolly, Alston & Bird, LLP, Atlanta, GA, for defendants.

### *EXPLANATION AND ORDER*

ANITA B. BRODY, District Judge.

Plaintiff Michael La Fata ("La Fata") brings this class action, alleging violations

of both federal and state law by defendants in connection with the sale of Raytheon Engineers and Constructors, Inc. ("RE & C") by Raytheon, Inc. ("Raytheon") and Raytheon Engineers and Constructors International, Inc. ("RECI") to Morrison Knudsen Corporation ("MK"), the predecessor to Washington Group International, Inc. ("Washington Group").

This class action challenges the failure to grant severance pay and other benefits to employees of RE & C in connection with the stock sale of RE & C to MK. In particular, plaintiff contends that this transaction terminated the employment of the class members, entitling them to severance pay and accrued vacation pay under the RE & C Severance Pay Policy. Plaintiff, a former employee of RE & C, has sued Raytheon, RECI, RE & C, Raytheon Engineers and Constructors, Inc. Severance Pay Plan ("the Severance Plan Defendant"), United Engineers and Constructors, Inc. ("UE & C"), Raytheon Company 1995 Stock Option Plan, John R. Galvin ("Galvin"), Barbara M. Barrett ("Barrett"), Ferdinand Colloredo–Mansfeld ("Colloredo–Mansfeld"), Alfred M. Zeien ("Zeien"), Daniel P. Burnham ("Burnham"), Shay D. Assad ("Assad"), and Washington Group. Plaintiff has brought claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the federal securities laws, and state common law.

**Factual Background**

La Fata alleges that, early in September 1999, executives and directors of Raytheon, RECI and RE & C began attempting to sell RE & C. MK performed some due diligence on RE & C in September 1999, though this fact was concealed from most RE & C employees. La Fata alleges that the defendants actively misrepresented the status of RE & C to these employees by informing them in two letters and through comments by Assad, CEO of RE & C, at a general meeting, that the company was not going to be sold.

In mid-April of 2000, Raytheon, RECI and MK signed an agreement for the sale of the stock of RE & C. During the next few months, the RE & C employees were informed of the impending closing of the sale through meetings, informational "Question and Answer" releases and information posted on MK's website. Among the information revealed during this period was the fact that, after the closing, RE & C would be reorganized from eight divisions to five, with much of the management of RE & C's old divisions being replaced. The sale closed on July 7, 2000 and is alleged to have had a major consequence: La Fata claims that this sale effected an involuntary termination of all RE & C employees, entitling them to severance pay under the RE & C Severance Pay Policy.

In the period leading up to, and possibly following, the stock sale of RE & C to MK, RE & C maintained several benefit programs for its employees. One such plan was the RE & C Termination of Employment Policy ("Termination Policy"), which sets out "fair and uniform standards for the termination of employees." The Termination Policy defines several types of voluntary and involuntary termination of employment, including layoff and reorganization, the two types of involuntary terminations relevant to this case. It also establishes payroll practices at the termination of employment. Article X of the Termination Policy authorizes severance pay for terminations of full-time employees classified as layoff, release or reorganization. This provision constitutes the RE & C Severance Pay Policy ("Severance Policy").

RE & C also maintained the RE & C Welfare Benefits Plan ("Welfare Benefits Plan") during the relevant period of time.

This document purports to provide "certain uniform terms for the employee benefit plans" it incorporates. Welfare Benefits Plan § 2.1. The Severance Policy is explicitly incorporated into the Welfare Benefits Plan. *See id.* at Appendix A. Each term of the Welfare Benefits Plan is considered to apply to all incorporated plans, including the Severance Policy, unless it "conflicts with, contradicts, or renders ambiguous" a term, provision, implication or statement in the incorporated plan. *Id.* at § 1.5.

**Procedural History**

La Fata filed the complaint in this class action on March 14, 2001, bringing claims pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* and Pennsylvania common law. He filed an amended complaint on April 11, 2001, adding allegations that defendants violated several provisions of the federal securities laws. *See* First Amended Complaint, at 45–47. The claims relevant to this opinion are:

1) Count I, a claim for benefits pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132;

2) Count II, a claim for benefits pursuant to § 510 of ERISA, 29 U.S.C. § 1140;

3) Count IX, alleging a state law breach of contract claim;

4) Count XI, alleging a state law breach of fiduciary duty claim;

5) Count XIII, alleging a state law unjust enrichment claim; and

6) Count XVII, alleging a state law breach of good faith and fair dealing claim.

*See* First Amended Complaint, at 37–58.

On July 9, 2001, La Fata filed a motion for class certification, seeking to certify both a Severance Class and a Stock Option Class. On March 21, 2002, I issued a memorandum and order, partially granting and partially denying plaintiff's motion for class certification. In that order, I certified a class consisting of:

All former employees of RE & C who were involuntarily terminated on or about July 7, 2000 as a result of the sale of RE & C to Washington Group and were entitled to a Final Payment (i.e., accrued severance pay and vacation pay) pursuant to ERISA which was wrongfully withheld and/or denied to them.

Memorandum and Order of March 21, 2002.

On October 29, 2001, defendants Raytheon, RECI, Raytheon Company 1995 Stock Option Plan, Galvin, Barrett, Colloredo–Mansfeld, Zeien, Burnham, and Assad filed a motion for partial summary judgment on counts I, II, IX, XI, XIII, and XVII.[1] On May 3, 2002, defendants RE & C, UE & C, Washington Group and the Severance Plan Defendant filed a motion to dismiss counts I, II, IX, XI, XIII, and XVII.[2] Further briefing has occurred on both of these motions and the parties assert that both motions are fully briefed. I shall discuss each motion separately.

**I. Washington Group Defendants' Motion to Dismiss**

On May 3, 2002, the Washington Group Defendants filed a motion to dismiss those portions of the amended complaint where plaintiff asserts claims for benefits pursuant to the Severance Policy. These claims include (1) Count I, a claim for benefits

---

**1.** However, the claims challenged in this motion were only brought against Raytheon and RECI, among these defendants. For the purposes of this opinion, I shall refer to Raytheon and RECI as the "Raytheon Defendants."

**2.** For the purposes of this opinion, I shall refer to these four defendants as the "Washington Group Defendants."

pursuant to § 502(a)(1)(B) of ERISA; (2) Count II, a claim for benefits pursuant to § 510 of ERISA; (3) Count IX, alleging a state law breach of contract claim; (4) Count XI, alleging a state law breach of fiduciary duty claim; (5) Count XIII, alleging a state law unjust enrichment claim; and (6) Count XVII, alleging a state law breach of good faith and fair dealing claim. On June 10, 2002, plaintiff filed a brief in opposition to the motion to dismiss. The Washington Group Defendants filed a reply brief on June 19, 2002. For the reasons that follow, defendants' motion to dismiss shall be denied with respect to Count I and Count II and granted with respect to Count IX, Count XI, Count XIII and Count XVII.

## A. Motion to Dismiss Standard

Rule 12(b)(6) permits the court to dismiss an action for failure to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6). The claim may be dismissed only if the plaintiff cannot demonstrate any set of facts in support of the claim that would entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Williams v. New Castle County*, 970 F.2d 1260, 1266 (3d Cir.1992). In considering the motion to dismiss, the court must accept as true all factual allegations in the complaint and all reasonable inferences that may be drawn therefrom, construing the complaint in the light most favorable to the plaintiff. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir.1997).

## B. Plaintiff's ERISA § 502(a)(1)(B) Claim

■ In Count I of the First Amended Complaint, plaintiff asserts a claim for benefits under the Severance Policy pursuant to § 502(a)(1)(B) of ERISA. The Washington Group Defendants have moved for dismissal of this claim, arguing that (1) the plain language of the Severance Policy requires an "involuntary termination of employment" as a prerequisite for payment of severance benefits and (2) Third Circuit precedent clearly indicates that the stock sale of a wholly-owned subsidiary does not constitute a termination of employment for the subsidiary's employees, regardless of whether they suffer a decrease of benefits as a result of the transaction. Plaintiff disagrees with this characterization of the applicable caselaw, asserting that a drastic reduction of benefits, in connection with a stock sale, constitutes a termination and thus permits him to recover severance benefits under the Severance Policy.

Addressing a severance pay plan under ERISA, the Third Circuit has held that, while severance pay is primarily intended to compensate employees for losses they incur because they have no job, this "does not necessarily mean that severance pay can be due only when employees are unemployed." *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 146–47 (3d Cir. 1987)(*rev'd on other grounds*). It has since reaffirmed this principle, holding that "severance pay benefits may be intended to compensate an employee for the possibility of lower salary and benefits even when his or her employment continues without interruption with a new employer." *Kotrosits v. GATX Corp. Non–Contributory Pension Plan*, 970 F.2d 1165, 1171 (3d Cir.1992). *See also, Ulmer v. Harsco Corp.*, 884 F.2d 98, 103 (3d Cir. 1989). The Third Circuit has noted that such severance benefits may be triggered by a drastic reduction in employee benefits occurring in connection with the sale of a division. *See Ulmer*, 884 F.2d 98. The reasoning of *Ulmer* has been extended by a court in this district to apply to a sale of the entire assets of a wholly-owned subsid-

iary. *See Chacosky v. Hay,* 1991 WL 12170, *6 (E.D.Pa. February 1, 1991).

The Third Circuit has not addressed whether the logic of *Ulmer* extends to a situation involving the stock sale of a wholly-owned subsidiary. Faced with this situation, the Eighth Circuit noted that, where an employee's conditions of employment are substantially identical before and after the stock sale, no severance pay obligations are triggered. *See Schroeder v. Phillips Petroleum,* 17 F.3d 1147, 1148–49 (8th Cir.1994). Where plaintiffs have alleged a decrease in benefits in connection with the stock sale of a wholly-owned subsidiary, several federal district courts have permitted the plaintiffs to proceed until at least the summary judgment stage. *See Ingalls v. Schlumberger, Ltd.,* 1994 WL 505004 (D.Me.1994)(summary judgment); *Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 839 (S.D.N.Y.1994)(trial).

Applying this legal framework to the facts of this case, it is clear that, at this stage of the litigation, Third Circuit precedent does not preclude plaintiff from proceeding on his § 502(a)(1)(B) claim against the Washington Group Defendants. In his complaint, plaintiff alleges that the sale of RE & C to Washington Group constituted an involuntary termination of the employment of himself and the other class members with RE & C. *See* First Amended Complaint, at ¶ 2. Plaintiff also alleges that, on July 7, 2000, the date that the sale of RE & C to Washington Group became final, plaintiff and the other class members ceased to be employed by RE & C and became employees of Washington Group. *See id.* at ¶ 110. Finally, plaintiff asserts that, in connection with the stock sale, "the benefits received by Plaintiff and the Class were reduced drastically." *Id.* at ¶ 119. These allegations, if supported by sufficient evidence, could entitle plaintiff and the class to recover under the standard laid out by the Third Circuit in *Ulmer.*

The plaintiff's legal theory is also supported by a brief examination of two cases the Washington Group Defendants rely on in arguing for dismissal of this claim. In their briefs, the Washington Group Defendants assert that both *Ingalls* and the Second Circuit's opinion in *Algie v. RCA Global Communications, Inc.,* 60 F.3d 956 (2d Cir.1995)(hereinafter *"Algie II"*), demonstrate that the stock sale of a wholly-owned subsidiary cannot constitute a termination of the subsidiary's employees. The procedural settings of both *Ingalls* and *Algie II* demonstrate, however, that plaintiff's § 502(a)(1)(B) claim must survive defendants' motion to dismiss. In *Ingalls,* the district court found that the plaintiffs could not go to trial on their § 502(a)(1)(B) claim, but only after holding that "[t]he plaintiffs have presented no evidence that [the subsidiary] ceased to exist as their employer" following the sale. 1994 WL 505004 at *3. Similarly, in distinguishing the *Algie* stock sale from an asset sale where severance benefits might be due, the Second Circuit relied upon a jury finding that the subsidiary's employees were still employed by the subsidiary following the stock sale. *See Algie II,* 60 F.3d at 961. The cases cited by the Washington Group Defendants support plaintiff's argument that he be given an opportunity to demonstrate that the class members were terminated by RE & C and had their benefits reduced in connection with the stock sale. Therefore, the Washington Group Defendants' motion to dismiss Count I shall be denied.

## C. Plaintiff's ERISA § 510 Claim

In Count II of the First Amended Complaint, plaintiff asserts a claim for benefits under the Severance Policy pursuant to § 510 of ERISA. Essentially, plaintiff argues that the defendants structured the sale of RE & C as a stock sale in order to preclude the class members from receiv-

ing severance pay. The Washington Group Defendants have moved for dismissal of this claim, arguing that the complaint improperly fails to allege that (1) plaintiff's employer engaged in prohibited conduct and (2) fails to allege any prohibited conduct that interferes with the employment relationship between plaintiff and RE & C. Plaintiff opposes the motion to dismiss in fairly conclusory terms, claiming that RE & C was involved in the structuring of the stock sale and that defendants have not conclusively proved that plaintiff was not an employee of either Raytheon or RECI.

Section 510 of ERISA prohibits interference with the protected rights of individuals granted under the provisions of ERISA or employee benefit plans covered by ERISA. *See* 29 U.S.C. § 1140. It provides, in relevant part, that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a [plan] participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan], this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.

The Supreme Court has unanimously held that § 510 applies not only to employee pension benefit plans, but also to employee welfare benefit plans. *See Inter–Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.*, 520 U.S. 510, 514–15, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997). However, most federal appellate opinions construing § 510 have discussed its applicability in the context of vested pension benefits. *See e.g., International Union, United Auto., Aerospace & Agr. Implement Workers of America, U.A.W. v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir.1999); *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.1987). In this context, the Third Circuit has noted that Congress enacted § 510 primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights. *See Gavalik*, 812 F.2d at 851. The Third Circuit has held that "the essential element of proof under § 510 is specific intent to engage in proscribed activity." *Id.* Direct evidence of such specific intent obviously suffices as a means of proving a § 510 claim. *See id.* at 852. However, the Third Circuit has also held that plaintiffs may attempt to make out a § 510 claim using circumstantial evidence. *See id.* To do so, the plaintiff must establish the existence of "(1) prohibited employer conduct, (2) taken for the purpose of interfering, (3) with the attainment of any right to which the employee may become entitled". *Id.* If plaintiff successfully establishes this prima facie case by a preponderance of the evidence, the defendant may then offer a legitimate, non-discriminatory reason for the challenged action, which plaintiff may seek to demonstrate to be pretextual. *See Gavalik*, 812 F.2d at 852. In the context of a class action, the plaintiff must establish that the prohibited conduct intended to interfere with employee rights was the employer's standard practice. *See id. (quoting Dillon v. Coles*, 746 F.2d 998, 1004 (3d Cir.1984)).

The Washington Group Defendants argue that plaintiff's § 510 claim must be dismissed because the complaint does not allege that his employer, RE & C, undertook any "prohibited conduct." They argue that a § 510 claim can only be brought against a plaintiff's employer and that the alleged prohibited conduct, the structuring of the stock sale of RE & C, was carried out by Raytheon, RECI and MK, none of whom were plaintiff's employer. As the complaint clearly includes an allegation that RE & C was involved in structuring the stock sale, the motion to dismiss must

be denied as to that defendant. *See* First Amended Complaint, at ¶¶ 49, 177, 179. With regard to the other defendants against whom this claim is brought, the text of § 510 clearly indicates that it is not limited to claims against employers. *See* 29 U.S.C. § 1140 ("It shall be unlawful for any person to discharge"); *Inter–Modal Rail,* 520 U.S. at 514–15, 117 S.Ct. 1513 (rejecting interpretation of § 510 that is clearly at odds with the plain language of the statute). To the extent that the actions of these defendants caused plaintiff to be discharged in connection with the stock sale of RE & C, plaintiff may be able to make out a § 510 claim against them. Therefore, the motion to dismiss must be denied with regard to Count II.

### D. Plaintiff's Supplemental State Law Claims

The Washington Group Defendants have moved to dismiss plaintiff's state law severance claims, asserting that these claims are preempted by § 514 of ERISA. They argue that the Severance Policy is indisputably an ERISA plan and that any state law claims that relate to this plan are preempted under the explicit language of § 514(a). In his response to the Washington Group Defendants' motion to dismiss, plaintiff concedes that these state law claims are preempted if the Severance Policy is found to be an ERISA plan.

### i. Existence of an ERISA Plan

■ The initial question a reviewing court must answer is whether a plan exists under ERISA and thus, whether claims for benefits must be brought under its exclusive remedies. ERISA covers employee welfare benefit plans and employee pension benefit plans. *See* 29 U.S.C. § 1002(3). An employee welfare benefit plan is defined, in relevant part, as:

> [A]ny plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, though the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services.

29 U.S.C. § 1002(1). This definition includes plans that provide employees with severance benefits upon the termination of employment. *See* 29 U.S.C. § 1002(1); *Massachusetts v. Morash,* 490 U.S. 107, 116, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989).

■ An employer can fairly easily establish the existence of an ERISA plan. *See Gruber v. Hubbard Bert Karle Weber, Inc.,* 159 F.3d 780, 789 (3d Cir.1998)(*quoting Credit Managers Ass'n v. Kennesaw Life & Accident Ins. Co.,* 809 F.2d 617, 625 (9th Cir.1987)). An ERISA plan exists if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Deibler v. United Food and Commercial Workers' Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992). The Third Circuit has held that the crucial factor in determining whether a plan has been established is "whether the employer has expressed an intention to provide benefits on a regular and long-term basis." *Id. See also, Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)("a one-time, lump-sum payment triggered by a single event requir[ing] ... little more than writ[ing] a check hardly constitutes the operation of a benefit plan").

Analyzing the evidence of record in this case from the viewpoint of a reasonable person, it is clear that the Severance Policy is an employee welfare benefit plan under ERISA. The Severance Policy is memorialized in paragraph X of the Termination Policy. *See supra,* n. 1. When read in connection with the rest of the Termination Policy, the terms of the Severance Policy clearly indicate an intent to establish a regular and ongoing severance plan for all RE & C employees terminated as a result of a layoff, release or reorganization. The explicit language of the Severance Policy describes the type and amount of benefits provided by the policy and the intended beneficiaries. The procedure for receiving such benefits, including notification of termination, employee checkout procedures and the payment of severance benefits are clearly set out in paragraphs V and VI of the Termination Policy. While the source of funds for the severance benefits is not made explicit, it may be gleaned from the surrounding circumstances. *See Deibler,* 973 F.2d at 210. From the provision for payment of severance benefits "in the first paycheck following an employee's termination date," it is clear that such benefits will be paid by RE & C. *See Fort Halifax,* 482 U.S. at 7 n. 5, 107 S.Ct. 2211 (noting that severance benefits under ERISA may be paid out of either a trust fund or an employer's general assets).

Taking each of these factors into account, I find that the Washington Group Defendants have successfully established that the Severance Policy is an employee welfare benefit plan under ERISA. As ERISA was intended to provide an exclusive legal framework for employee benefit plans, I must now consider the effect of my finding that the Severance Policy is an ERISA plan on plaintiff's various non-ERISA claims.

### ii. Preemption of State Law Claims

Section 514(a) of ERISA, codified at 29 U.S.C § 1144(a), provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C § 1144(a). The Supreme Court has held that this provision has a broad scope, preempting any state-law causes of action related to claims for benefits under employee benefit plans. *See FMC Corporation v. Holliday,* 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 43, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). It has specifically held that state law breach of contract claims are preempted by ERISA. *See Pilot Life,* 481 U.S. at 43, 107 S.Ct. 1549; *see also, Pane v. RCA Corp.,* 868 F.2d 631, 635–36 (3d Cir.1989). The Washington Group Defendants argue that plaintiff's state law claims for breach of contract, breach of fiduciary duty, unjust enrichment and breach of covenant of good faith and fair dealing are all subject to ERISA's broad preemption provision and therefore, must be dismissed. In his response to the Motion to Dismiss, plaintiff concedes that, to the extent the Severance Policy is an ERISA plan, his state law severance claims are preempted. As the Severance Policy is an employee welfare benefit plan under ERISA, plaintiff's state law severance claims are preempted. This preemption applies not only to the Washington Group Defendants, but to all defendants in the case, as § 514 of ERISA preempts any state law claims that relate to an employee benefit plan. *See FMC Corporation,* 498 U.S. at 58, 111 S.Ct. 403. Therefore, Counts IX, XI, XIII and XVII of the amended complaint are dismissed with regard to all defendants in this lawsuit.

### E. Motion to Stay Discovery

The Washington Group Defendants filed a motion to stay discovery pending resolu-

tion of their motion to dismiss. In light of my resolution of the motion to dismiss, the motion to stay discovery is moot and shall therefore be denied.

## II. Raytheon Defendants' Motion for Summary Judgment

On October 29, 2001, the Raytheon Defendants filed a motion for summary judgment in which they raise several arguments as to why they are entitled to judgment on the various severance pay claims. On March 25, 2002, plaintiff filed his response in opposition to the Raytheon Defendants' motion for summary judgment. Plaintiff's response memorandum includes not only his arguments opposing the Raytheon Defendants' request for summary judgment, but also a request that I enter summary judgment in his favor against Raytheon and RECI. On April 29, 2002, the Raytheon Defendants filed a reply brief, addressing both their motion for summary judgment and plaintiff's request for summary judgment. Finally, on May 6, 2002, plaintiff filed a sur-reply brief.

The Raytheon Defendants' motion for summary judgment seeks entry of judgment in their favor on several claims of the First Amended Complaint. With regard to Claims I, IX, XI, XIII, and XVII, they claim that the stock sale of RE & C did not extinguish its legal existence, so that a termination of RE & C's employees could not have occurred on the date of the stock sale. The Raytheon Defendants also argue that summary judgment must be granted on Claims I and IX, as the stock sale did not constitute or create a layoff, release or reorganization within the meaning of the Severance Policy. With regard to Claim IX, a common law breach of contract claim, the Raytheon Defendants argue that it is preempted by ERISA and therefore, summary judgment must be granted on that claim, as well as plaintiff's other state common law claims. They also

claim that Claim II must fail, as the stock sale did not effect a change in the employer-employee relationship between plaintiff and RE & C that interfered with plaintiff's attainment of benefits under the Severance Policy. The Raytheon Defendants also assert that, if RE & C ceased to exist on the date of the stock sale, then the Severance Policy also terminated on that date, leaving plaintiff unable to assert any claims under it. They also claim that plaintiff failed to exhaust available administrative remedies prior to filing suit and that he has not provided sufficient evidence to excuse this failure. Finally, the Raytheon Defendants assert that neither Raytheon nor RECI can be held liable for any severance pay owed to plaintiff by RE & C and must therefore be granted summary judgment on all claims against them.

Plaintiff responds to these arguments by asserting that (1) the Severance Policy had no administrative procedures associated with it, (2) the Severance Policy was in effect at the time he was terminated, and (3) he has adduced evidence of his termination sufficient not only to create a question of material fact, but to merit an entry of summary judgment in his favor, sua sponte.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must determine "whether the evidence presents a sufficient [factual] disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the Court must view the evidence, and draw all reasonable inferences, in the light most favorable to the non-moving party. *See Dici v. Com. of Pa.*, 91 F.3d 542, 547 (3d Cir.1996). However, when the nonmoving party "bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n. 5 (3d Cir.1998)(*quoting Wetzel v. Tucker*, 139 F.3d 380, 383 n. 2 (3d Cir.1998)).

### B. The Raytheon Defendants' Liability for Severance Pay

In seeking to hold the Raytheon Defendants, Raytheon and RECI, liable for severance pay, plaintiff relies upon both direct and indirect theories of liability. Plaintiff bases his argument for direct liability upon the control that Raytheon allegedly asserted over the policies and employment practices of RE & C. Plaintiff also asserts that the Raytheon Defendants are indirectly liable for severance pay pursuant to § 9.3(d) of the Stock Purchase Agreement between Raytheon, RECI and MK ("Stock Purchase Agreement"). The Raytheon Defendants deny that they can be found liable for severance pay under either of these theories. I shall discuss each theory of liability separately.

### i. Direct Liability

■ The parties agree that, prior to July 7, 2000, plaintiff was an employee of RE & C. However, in his First Amended Complaint, plaintiff asserts that, by its control over the policies and employment procedures of its subsidiaries, Raytheon was effectively his employer at the time that the stock sale closed. *See* First Amended Complaint, at ¶ 44. Plaintiff also alleges that several of the employee benefit plans in which he participated, including the Termination Policy and the Severance Policy, were Raytheon Company policies that "govern[ ] the terms of employment between Raytheon, [RE & C] and its employees." *Id.* at ¶¶ 94–95. I interpret these allegations to argue that the separate legal status of RE & C be disregarded and that plaintiff be allowed to proceed directly against Raytheon and RECI in their claims for severance benefits.

The Third Circuit has held that "mere ownership of a subsidiary does not justify the imposition of liability on the parent." *Pearson v. Component Technology Corp.*, 247 F.3d 471, 484 (3d Cir.2001)(*citing United States v. Bestfoods*, 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)). However, in order to prevent abuse of the corporate form, a court may utilize the equitable tool known as "piercing the corporate veil." *See Pearson*, 247 F.3d at 484. The Third Circuit has noted that Pennsylvania law does not permit piercing of the corporate veil "unless the party seeking to pierce the corporate veil on an alter-ego theory establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." *Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 14 (3d Cir.1990). Plaintiff has provided no evidence that would justify piercing the veil in this case.[3] Therefore, to the extent that plaintiff

---

3. In his sur-reply brief opposing the Raytheon Defendants' request for summary judgment, plaintiff appears to expressly disavow any reliance upon an alter-ego theory of liability. *See* Plaintiff's Sur–Reply, at 5 n. 5 ("Raytheon also has argued an alter ego theory to show that Raytheon is not responsible for any severance benefit. However, this theory was not asserted by Plaintiff and should be disregarded by the Court as a straw-man argument"). This admission supports my finding that there

seeks to hold the Raytheon Defendants liable for severance pay, he cannot do so under a theory of direct liability.

### ii. Indirect Liability

█ Plaintiff also argues that, if he is entitled to severance benefits pursuant to the Severance Policy, § 9.3(d) of the Stock Purchase Agreement entitles him to collect them directly from Raytheon and RECI. Section 9.3(d) states, in relevant part:

> The Sellers [defined as Raytheon and RECI] shall be responsible for . . . severance, change of control or similar amounts payable to any Assumed Employees [defined as all employees of RECI subsidiaries, including RE & C, at the closing of the stock sale] and arising solely from the consummation of the transactions contemplated by this Agreement.

Stock Purchase Agreement, at 69. Plaintiff argues that this provision creates third-party beneficiary rights in himself and the other Assumed Employees, permitting them to seek severance pay directly from Raytheon and RECI. The Raytheon Defendants challenge plaintiff's conclusion that § 9.3(d) gives rise to any third-party rights.

Under this theory of liability, the Raytheon Defendants are only indirectly liable to plaintiff. The language of § 9.3(d) clearly contemplates that an independent determination of an Assumed Employee's entitlement to severance is required before any rights under § 9.3(d) are triggered. Indeed, the parties recognize that, for the Raytheon Defendants to be held liable under § 9.3(d), plaintiff must first demonstrate that he is entitled to severance benefits under the Severance Policy.[4] Thus, before reaching the question of whether plaintiff may assert any rights under § 9.3(d), I must first decide whether plaintiff is entitled to severance benefits under the Severance Policy.

Plaintiff and the Raytheon Defendants have addressed the issue of plaintiff's entitlement to severance benefits under the Severance Policy in their briefing of the cross-motions for summary judgment. However, the Washington Group Defendants, particularly the Severance Plan Defendant,[5] have not yet completed discovery or briefing of this complex issue.[6] It is

is no evidence in the record suggesting that Raytheon ignored the corporate existence of RE & C or dominated and controlled RE & C to an extent sufficient to justify piercing RE & C's separate legal existence.

4. *See* Plaintiff's Response to the Raytheon Defendants' Motion for Summary Judgment, at 27 ("Because, as explained below, the Plaintiff and the Class were terminated and are entitled to severance as a result, [§ 9.3(d) of] the Purchase Agreement provides that such severance benefits are the liability of Raytheon and RECI"); Raytheon Defendants' Reply to Plaintiff's Response, at 27 ("even assuming, arguendo, that Plaintiff could prove his entitlement to benefits under the RE & C Termination of Employment Policy or Severance Pay Policy [he cannot assert any rights under § 9.3(d) ]").

5. Many courts have held that a § 502(a)(1)(B) claim for benefits may only be brought

against ERISA plans, plan administrators, and fiduciaries. *See Rush Prudential v. Moran*, 536 U.S. 355, 122 S.Ct. 2151, 2158 n. 3, 153 L.Ed.2d 375 (June 20, 2002)(citing cases). While the Third Circuit has not explicitly adopted this position, *see Curcio v. John Hancock Mut. Lif. Ins. Co.*, 33 F.3d 226, 233 (3d Cir.1994), this caselaw suggests that the Severance Plan Defendant is the proper party to oppose plaintiff's claim for benefits under § 502(a)(1)(B).

6. The uneven procedural balance of this case is due largely to bankruptcy stays granted to defendants Washington Group, UE & C and the Severance Plan Defendant. The result of these stays is that (1) plaintiff has not been given the opportunity to engage in full discovery with the Washington Group Defendants, and (2) the Severance Plan Defendant, which I assume to be the proper defendant to plaintiff's § 502(a)(1)(B) claim for severance benefits, has not had an opportunity to brief the

vital that my determination of plaintiff's entitlement to severance pay be made on a complete factual record and with input from the parties who should properly contest the issue.[7] In light of the incomplete factual record and lack of briefing by the Washington Group Defendants on the issue of plaintiff's entitlement to severance pay under the Severance Policy, the summary judgment motions of plaintiff and the Raytheon Defendants are premature. Therefore, I shall deny both motions without prejudice to reassertion at the close of discovery between plaintiff and the Washington Group Defendants.

### iii. Plaintiff's Motion to Expand the Record and for Additional Discovery

On June 12, 2002, plaintiff filed a motion, seeking additional discovery from the Washington Group Defendants and leave to expand the summary judgment record. In light of my resolution of the Washington Group Defendants' motion to dismiss, plaintiff's motion is moot. Consistent with general principles of civil practice in the Eastern District of Pennsylvania, once a motion to dismiss has been resolved, the parties proceed to discovery on the remaining claims. Therefore, plaintiff is entitled to engage in discovery with the Washington Group Defendants. As such, his motion for additional discovery is moot and shall be denied.

### *ORDER*

**AND NOW**, this day of August, 2002, consistent with the discussion in the attached memorandum, it is **ORDERED** that:

1) The Washington Group Defendants' Motion to Dismiss (Docket Entry # 56) is **GRANTED** as to Count IX, a state law breach of contract claim; Count XI, a state law breach of fiduciary duty claim; Count XIII, a state law unjust enrichment claim; and Count XVII, a state law breach of good faith and fair dealing claim. The Motion to Dismiss (Docket Entry # 56) is **DENIED** as to Count I, a claim for benefits pursuant to § 502(a)(1)(B) of ERISA, and Count II, a claim for benefits pursuant to § 510 of ERISA.

2) The Washington Group Defendants' Motion for a Limited Stay of Discovery (Docket Entry # 62) is **DENIED** as moot.

3) The Raytheon Defendants' Motion for Partial Summary Judgment (Docket Entry # 33) is **DENIED** without prejudice to refiling at the close of the additional discovery period.

4) Plaintiff's Motion for Summary Judgment as to Liability (included in Docket Entry # 47) is **DENIED** without prejudice to refiling at the close of the additional discovery period.

5) Plaintiff's Motion to Supplement the Record and for Additional Discovery (Docket Entry # 0–1, dated 6/11/02) is **DENIED** as moot.

---

severance issue for purposes of summary judgment.

7. Plaintiff argues that Raytheon's liability for severance is proven beyond any issue, even under his indirect theory of liability, by a statement made by Raytheon Senior Compensation Analyst Kathleen McLaughlin ("McLaughlin"). In a sworn declaration, McLaughlin states that "for purposes of the Stock Option Plan, Raytheon classified RE & C employees ... as having ceased to perform services by reason of layoff." Sur–Reply Brief, at 2. However, plaintiff fails to cite to any legal authority for the proposition that this statement serves as a binding resolution of Raytheon's liability for severance payments under the Severance Policy.

6) An appropriate scheduling order will be issued.