**Michael LA FATA, et al. Plaintiffs,**

v.

**RAYTHEON COMPANY, et al. Defendants.**

No. 01–CV–1220.

United States District Court, E.D. Pennsylvania.

Jan. 30, 2004.

---

400

Bryan R. Lentz, Bochetto & Lentz, David H. Weinstein, Edward F. Kalman, Kellie A. Allen, Paul J. Scarlato, Robert S. Kitchenoff, Weinstein, Kitchenoff, Scarlato & Goldman, Ltd., Philadelphia, PA, for Plaintiff.

Andrew W. Allison, James M. Wilson, Littler Mendelson Prof. Corp., Philadelphia, PA, Gregory C. Braden, H. Douglas Hinson, Michael G. Monnolly, Alston & Bird LLP, Atlanta, GA, Richard J. Antonelli, Littler Mendelson PC, Pittsburgh, PA, Steven K. Ludwig, Fox Rothschild O'Brien & Frankel, LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Michael La Fata ("La Fata") is a former employee of Raytheon Engineers and Constructors, Inc. ("RE & C"). Prior to July 7, 2000, RE & C was a wholly-owned subsidiary of defendant Raytheon Engineers and Constructors International, Inc. ("RECI"). RECI is a wholly-owned subsidiary of defendant Raytheon, Inc. ("Raytheon"). La Fata originally filed a 17–count class action complaint against a number of defendants [1] for violations of the Employee Retirement Income Security

1. The original defendants were: Raytheon, RECI, RE & C, RE & C Severance Pay Plan, United Engineers & Constructors, Inc. ("UE & C"), Raytheon Company 1995 Stock Option Plan, John R. Galvin, Barbara M. Barrett, Ferdinand Colloredo–Mansfeld, Alfred M. Zeien, Daniel P. Burnham, Shay D. Assad, and Washington Group.

Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, federal securities laws, and state common law.[2] At this time, only two[3] counts remain: Count I, a claim for benefits pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B),[4] and Count II, a claim for benefits pursuant to § 510 of ERISA, 29 U.S.C. § 1140.[5] Raytheon and RECI are the only remaining defendants.[6] Before me are the cross-motions for summary judgment filed by the parties on the two remaining counts. This court has jurisdiction based on the existence of a federal question. For the following reasons, I grant defendants' motion for summary judgment on both Count I and Count II.

2. On March 21, 2002, I certified the following class:

All former employees of RE & C who were involuntarily terminated on or about July 7, 2000 as a result of the sale of RE & C to Washington Group and were entitled to a Final Payment (i.e., accrued severance pay and vacation pay) pursuant to ERISA which was wrongfully withheld and/or denied to them. Excluded from the "Severance Class" are any RE & C employees who were terminated for cause, any RE & C employees who received a Final Payment, and the former officers and directors of RE & C, their legal representatives, heirs, successors or assigns.

3. On February 25, 2002, Counts III, IV, V, and VI were dismissed because La Fata failed to demonstrate that the Raytheon Stock Option Plan was an employee pension benefit plan within the meaning of ERISA. On August 27, 2002, Counts IX, XI, XIII, and XVII were dismissed on the grounds that these state law claims were preempted by ERISA. On July 21, 2003, La Fata voluntarily withdrew his remaining individual stock option claims brought pursuant to the Exchange Act and common law, i.e., Counts VII, VIII, X, XII, XIV, XV, XVI.

4. Section 502(a)(1)(B) of ERISA establishes a cause of action under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). It provides, in relevant part, that:

A civil action may be brought by a participant or beneficiary to recover benefits due

## I. Facts Stated Most Favorably to Plaintiff

In March of 1993, La Fata began working for RE & C as an engineer. (First Am. Compl. ¶ 28.) RE & C and its owner, RECI,[7] are Delaware corporations. (App. Supp. D's Mot. Summ. J. Ex. B.) La Fata was provided a number of benefits as an RE & C employee. Those benefits included: the option to participate in an RE & C-sponsored defined pension benefit plan, the option to participate in a Raytheon-sponsored savings and investment plan with an employee stock ownership component, the option to participate in the Raytheon Scholars Program, which provided

to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

5. Section 510 of ERISA prohibits interference with the protected rights of individuals granted under the provisions of ERISA or employee benefit plans covered by ERISA. *See* 29 U.S.C. § 1140. It provides, in relevant part, that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a [plan] participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan], this subchapter, or the Welfare and Pension Plans Disclosure Act.

6. On August 18, 2003, I approved a settlement agreement between plaintiffs and Washington Group and its predecessors and successors including MK, RE & C, UE & C, and the Raytheon Engineers and Constructors, Inc. Severance Pay Plan. On June 24, 2003, the remainder of the defendants filed a motion for summary judgment on all remaining counts. Because La Fata withdrew all remaining counts except for Counts I and II, RECI and Raytheon are the only defendants that remain.

7. RECI is a wholly-owned subsidiary of Raytheon.

cash awards to the children of Raytheon employees to be used for costs associated with undergraduate programs, access to medical, dental, and disability coverage, and a non-discretionary severance plan for involuntary termination of RE & C employment known as the RE & C Severance Pay Policy ("Severance Pay Policy"). (App. Supp. D's Mot. Summ. J. Ex. R.) Some of the constituent benefit programs enjoyed by La Fata are expressly incorporated into what is known as the Welfare Benefit Plan. The Welfare Benefit Plan operates as an umbrella plan for the other RE & C employee plans, supplying "certain uniform terms for the employee benefit plans." (App. Supp. D's Mot. Summ. J. Ex. C at § 2.1.) Each term of the Welfare Benefits Plan is considered to apply to all incorporated plans unless it "conflicts with, contradicts, or renders ambiguous" a term, provision, implication or statement in the incorporated plan. (*Id.* at § 1.5.) The rules of each incorporated plan regarding eligibility, enrollment, coverage, and termination of coverage of eligible employees are set forth in each incorporated plan's "Constituent Benefit Program Document." (*Id.* at § 3.2.) The Welfare Benefits Plan contains a termination provision. It provides:

In the event of any dissolution, merger, consolidation, or reorganization of the Employer in which the Employer is not the survivor, the [Welfare Benefits Plan] shall terminate with respect to the Employer and its Employees unless the Plan is continued by the successor to the Employer and such successor agrees to be bound by the terms and conditions of the Plan.

*Id.* at § 7.4.

The Severance Pay Policy is one of the constituent benefit programs explicitly incorporated into the Welfare Benefits Plan. (*Id.* at App. A.)[8] The Severance Pay Policy is not a stand-alone policy. The Severance Pay Policy is section X of a larger employment policy, the RE & C Termination of Employment Policy ("Termination Policy").[9]

The Termination Policy sets out "fair and uniform standards for the termination of employees." (Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. A.) In Section IV of the Termination Policy, several types of voluntary and involuntary terminations of employment are described. Of the four types of involuntary terminations defined, Section X, the Severance Pay Policy, specifies that severance pay will be authorized for those terminations of full-time employees classified as layoff,[10] release,[11] or reorganization.[12] (*Id.*) Section IX of the Ter-

8. *See also id.* at § 1.4 ("Any reference herein to the [Welfare Benefits] Plan includes each Constituent Benefit Program unless otherwise indicated, irrespective of the fact that certain references herein are to specific Constituent Benefit Program(s)."); *Id.* at § 2.2 ("The Constituent Benefit Programs and the Constituent Benefit Program Documents in their entirety are hereby incorporated by reference herein and made a part of the [Welfare Benefits] Plan.").

9. The Severance Pay Policy is explicitly incorporated into the Welfare Benefit Plan, however, the Termination of Employment Policy is not listed as one of the constituent benefit programs incorporated into the Welfare Benefit Plan.

10. Section IV B(1) defines layoff as "an involuntary termination of employment with the Company, when, because of economic or organizational reasons, a reduction in work forces is required."

11. Section IV B(2) defines release as "an involuntary termination of employment with the company when it is determined that an employee cannot, through no fault of their own, perform the work assigned."

12. Section IV B(3) defines reorganization as "an involuntary termination of employment due to a change in Company structure."

mination Policy states:

> Any accrued vacation [13] and severance pay, if applicable, will be included on the first paycheck following an employee's termination date.

*Id.*

In about September 1999, executives and directors of Raytheon, RECI, RE & C, and Morrison Knudsen Corporation ("MK") commenced discussions in the hope of selling its RE & C stock to MK. (Decl. Pl.'s Mot. Summ. J. Ex. 5, 8, 9.) At that time, RE & C had eight operating divisions. (*Id.* Ex. 27.) Also at that time, MK performed some due diligence on RE & C. (*Id.* Ex. 8.) MK is an Ohio corporation. (*Id.* Ex. 21.) The initial proposal between Raytheon and MK was structured as an asset sale. (*Id.* Ex. 5.) Likewise, the Term Sheet outlining the proposed acquisition of RE & C by MK structured the transaction as an asset purchase. (*Id.* Ex. 31.) An early draft of the agreement of sale was entitled a "Stock and Asset Purchase Agreement." (Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. G.) Members of Raytheon's Human Resources Leadership Team discussed structuring the sale as a stock sale as opposed to an asset sale because they believed that a stock sale would not trigger the obligations of the RE & C Severance Pay Policy. (Decl. Pl.'s Mot. Summ. J. Ex. 7.) In November or December of 1999, Raytheon proposed structuring the sale as a sale of stock. (*Id.* Ex. 5.)

On February 11, 2000, Shay Assad, Executive Vice–President of Raytheon and Chairman and Chief Executive Officer of RE & C, sent a letter to all RE & C employees pledging that an employee benefit program involving RE & C's performance sharing plan would continue in 2000,

and expressed hope "to put extra money in everyone's pocket this time next year." Assad's letter made no mention of a potential sale. (App. Supp. D's Mot. Summ. J. Ex. Q.) Also in February 2000, La Fata's employment title became that of construction or project manager for RE & C's PECO Contractor and Project Manager Group. (*Id.* Ex. F.)

Sometime in mid-April of 2000, Raytheon, RECI, and MK signed an agreement for the sale of the stock of RE & C to MK. (Decl. Pl.'s Mot. Summ. J. Ex: 5.) Section 9.1(a) of the Stock Purchase Agreement (the "Agreement") provides that:

> At the Closing, the Buyer will or will cause an RECI Company to offer employment to those individuals listed on Schedule 9.1, each an employee of one or another of the Sellers primarily engaged in providing services with respect to the Purchased Business. The offer for each such individual shall be for the same base pay as such individual receives as of the Closing Date and with benefits satisfying the Buyer's obligations under Section 9.2. The employment with the Buyer (or an RECI Company) of all such employees accepting such offers will be deemed to have commenced immediately after 11:59 p.m., Boston local time, on the Closing Date.

Parties' Joint Summ. J. Ex. 1.

Section 9.1(c) provides:

> The Sellers shall remain responsible for any severance benefits, termination indemnity payments, or similar payments, if owed to any individual made an offer of employment as provided in paragraph (a) above who does not accept such offer.

Parties' Joint Summ. J. Ex. 1.

Section 9.3(d) provides:

---

**13.** La Fata's claim for benefits includes vacation pay, but vacation pay is not independently discussed by the parties. Henceforth, any discussion of severance pay includes any applicable vacation pay.

The Sellers shall be responsible for amounts payable and any other obligations under the Retention Agreements not specifically addressed in this Section 9.3, when and if such obligations become due, and for severance, change of control or similar amounts payable to any Assumed Employees and arising solely from the consummation of the transactions contemplated by this Agreement.

Parties' Joint Summ. J. Ex. 1.

Section 16.4 provides:

The validity and construction of the agreement shall be governed by the internal laws (and not choice-of-law rules which would require the application of the laws of another jurisdiction) of the state of New York.

Parties' Joint Summ. J. Ex. 1.

Section 16.9 provides:

Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any person, firm or corporation, except the Sellers and the Buyer and as provided in Article 13 with respect to the Buyer Indemnified Parties and the Seller Indemnified Parties, any rights or remedies under or by reason of this Agreement.

Parties' Joint Summ. J. Ex. 1.

The Stock Purchase Agreement did not require MK to provide or maintain benefits for RE & C employees at an aggregate level comparable to those provided by RE & C. (Decl. Pl.'s Mot. Summ. J. Ex. 9.)

By at least May 2000, RE & C employees were informed of the changes that would result from the closing of the sale through meetings, "MK–RE & C Integration Q & A Sheet" releases ("Q & A Sheet"), and other information posted on a transitional website. (*Id.* Ex. 14.) An un-dated document entitled *MK & RE & C Weekly Connection* stated that the "transition team is developing answers to any questions you might have regarding timelines, benefits, and the reorganization." (*Id.* Ex. 28.) The May 8, 2000 Q & A Sheet referred to the "integration of MK and RE & C" and the "new organization." (*Id.* Ex. 14.) The May 8, 2000 Q & A Sheet also instructed RE & C employees that they will continue on the "existing RE & C payroll and benefits programs through the end of 2000." (*Id.*) The May 26, 2000 Q & A sheet revealed that MK and RE & C would be integrated into one organization with five divisions. (*Id.* Ex. 26.)

The stock sale closed on July 7, 2000. (Decl. Pl.'s Mot. Summ. J. Ex. 6.) The Ohio Secretary of State certified that on that same day records were filed showing that RE & C, a Delaware company qualified to do business in Ohio, merged into MK, an Ohio corporation. (*Id.* Ex. 21.) The Ohio Secretary of State further certified that MK was the survivor of the merger, and that the survivor's corporate title was changed to Washington Group International Inc. ("Washington Group"), an Ohio corporation. (*Id.*) The Ohio Certificate of Merger indicated the same. (*Id.* Ex. 22.) The Delaware Secretary of State certified that on July 10, 2000, a Certificate of Ownership and Merger was filed merging RE & C into Washington Group. (Opp'n Defs.' Pl.'s Mot. Summ. J. Ex. 1.) The Delaware Certificate of Ownership and Merger included the resolutions passed by Washington Group's Board of Directors on July 7, 2000 to merge RE & C into Washington Group. Two of the relevant resolutions provide:

RESOLVED that Raytheon Constructors Inc. be merged into the Corpora-

tion[14] and that all of the estate, property, rights, privileges, powers, and franchises of Raytheon Constructors Inc. be vested in and held and enjoyed by the Corporation as fully and entirely and without change or diminution as the same were before held and enjoyed by Raytheon Constructors Inc. in its name.

RESOLVED that the Corporation assume all of the obligations of Raytheon Constructors Inc.

*Id.*

There is some evidence suggesting that former RE & C employees no longer worked for RE & C after the day of the closing. First, information provided to RE & C employees on the day the stock sale closed included the July 7, 2000 Q & A sheet which referenced "[f]ormer RE & C employees." (Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. N.) Secondly, a stock option report prepared by Raytheon for La Fata covering the time period between June 1, 1995 to July 7, 2000 described the transactions that took place on July 7, 2000 as "Cancel: Terminated." (Decl. Pl.'s Mot. Summ. J. Ex. 23.) Finally, under the terms of the MK/WGI 401(k) plan, years of service for RE & C employees were calculated using July 8, 2000 as the first day of employment with Washington Group and July 7, 2000 as the last day of employment with RE & C. (*Id.* Ex. 24.) La Fata continued to be a construction or project manager for the PECO Contractor and Project Manager Group after the close of the stock sale. (App. Supp. D's Mot. Summ. J. Ex. H § 2.)

Some of the benefits RE & C employees had enjoyed prior to the stock sale were altered on July 7, 2000, the day the stock sale closed. (App. Supp. D's Mot. Summ. J. Ex. R.) The defined benefit pension plan RE & C had provided for its employees prior to the close of the stock sale was eliminated. (Decl. Pl.'s Mot. Summ. J. Ex. 6.) RE & C employees were no longer eligible to participate in the Raytheon Scholars program. (Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. N.) While Raytheon had provided its employees, including RE & C employees, a stock ownership component in its 401(k) savings and investment plan prior to the stock sale, (Decl. Pl.'s Mot. Summ. J. Ex. 18) the 401(k) plan offered to RE & C employees on July 7, referred to by the defendants as the "MK/WGI 401(k) plan," did not offer employer stock as an investment option.[15] (App. Supp. D's Mot. Summ. J. Ex. R.) With one exception,[16] an RE & C employee's unvested stock options expired at the closing date. (Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. N.) The MK/WGI 401(k) plan also differed from the Raytheon savings and investment plan in two other ways. First, while the prior plan had allowed the contribution of both pre-tax and post-tax dollars, the MK/WGI 401(k) plan did not allow for after-tax contributions. (App. Supp. D's Mot. Summ. J. Ex. R.) Second, as compared to the prior plan in which employer-contributions vested immediately (*Id.* Ex. R), employer-matching contributions in the MK/WGI 401(k) plan vested over a five year period.

---

14. The Certificate refers to Washington Group as the "Corporation" and makes clear that RE & C is what is being referenced as "Raytheon Constructors Inc." in the resolutions.

15. This provision is not in controversy.

16. If an employee was eligible to retire, i.e., fifty-five or older with ten years or more of company service, as of the closing date, and had an outstanding option granted at least twelve months prior to the closing, any unvested shares continued to vest as scheduled. (Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. N.)

(Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. N.)

There is conflicting evidence as to whether the Severance Pay Plan was altered on the day the stock sale closed. Defendants claim the Severance Pay Policy was unchanged on July 7, 2000. (App. Supp. D's Mot. Summ. J. Ex. R.) However, a document, presumably an internal memo, entitled "Talking Points Regarding Immediate Removal of RE & C Severance Policy" states that "If a Washington Group International, Inc. employee is laid off due to the acquisition, he/she will receive a *modified* legacy RE & C severance package. (The modified package does not include salary continuation.)" (italics added) (Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. E.) The document further states "[Making RE & C employees immediately subject to the MK severance policy after the acquisition] will lead to employee anger and poor employee relations, and the impact will ripple throughout the organization." The document concludes:

It is recommended that we continue the RE & C severance policy (without salary continuation) for all RE & C employees laid off between now and the end of 2000, and beyond the end of 2000 for those employees identified as critical to the transition into the first quarter of 2001.

*Id.*

On August 25, 2000, the Q & A sheet released that day announced:

"RE & C's severance pay plan was terminated on August 25, 2000.[17] Employees laid off before that date as a result

of the integration between RE & C and MK receive severance according to an interim plan."

Decl. Pl.'s Mot. Summ. J. Ex. 20.

The Q & A Sheet did not elaborate as to what the "interim plan" was.

On January 1, 2001, Washington Group implemented changes to its medical, dental, and disability pay. (*Id.* Ex. 18.) On January 7, 2001, La Fata tendered his resignation to his supervisor at Washington Group. (App. Supp. D's Mot. Summ. J. Ex. M.)

On February 19, 2001, the Washington Group Manager of Human Resources responded to an undated letter from a member of the present class requesting his severance benefits. (Decl. Pl.'s Mot. Summ. J. Ex. 29, 30.) A relevant portion of the letter read:

In response to your letter to both Raytheon Company and Washington Group International regarding severance, former RE & C employees were not eligible for severance pay as a result of the sale of the company to Morrison Knudsen. Their employment with RE & C was not terminated; the sale represented a change of ownership and not a change of employment.

The parties have filed cross-motions for summary judgment on the remaining counts. The issue before me in Count I is twofold: 1) whether plaintiff and the class were entitled to receive the benefits conferred by the Termination of Employment Policy, including the receipt of severance pay,[18] and 2) if so, if Raytheon and RECI

---

**17.** The Vice–President of Compensation and Benefits of Washington Group International declared in an affidavit that "[t]he RE & C Severance Pay Plan was terminated as of July 7, 2000, by retroactive amendment to the plan executed on August 25, 2000." (Decl. Pl.'s Mot. Summ. J. Ex. 18.)

**18.** The complaint alleges that La Fata has been *wrongfully denied both severance and vacation pay.* The Termination of Employment Policy does not state when an employee is entitled to vacation pay. It only provides:

Any accrued vacation and severance pay, if applicable, will be included on the first

are liable for such payments. The issue before me in Count II is whether Raytheon and RECI violated § 510 of ERISA through the structure of the sale of RE & C to MK. I grant defendants' motion for summary judgment on both Count I and Count II for the reasons below.

## II. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must determine "whether the evidence presents a sufficient [factual] disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The issue before me involves employer obligations under an employee benefit plan. When the summary judgment motion pertains to the interpretation of a contract, I must first decide whether the terms of the contract are clear or ambiguous. A court " 'must determine that the contract is so clear that it can be read only one way.' If the opposing party asserts a reasonable reading differing from that of the district court, then the meaning of the contract must be resolved at trial." *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 656 (3d Cir.1990) (*quoting Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir.1987)).

paycheck following an employee's termination date.
Decl. Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. A.

## III. Discussion

La Fata brought this action against Raytheon and RECI to recover the amount of severance pay to which La Fata claims he became entitled when Raytheon and RECI sold its stock in RE & C to MK. In Count I, La Fata claims that he was terminated from RE & C when Raytheon and RECI sold RE & C stock to MK and that Raytheon and RE & C are bound by the Stock Purchase Agreement to pay the severance pay he is owed. In Count II, La Fata claims that Raytheon and RECI structured the sale of RE & C to MK as a stock sale for the purpose of interfering with La Fata's attainment of severance pay under the Severance Pay Policy.

### A. Count I

In step one of his argument under Count I, La Fata argues that when Raytheon and RECI sold the stock of its subsidiary RE & C to MK, La Fata was terminated under the terms of the RE & C Severance Pay Policy. This termination entitled him to severance pay under the Severance Pay Policy. In step two under Count I La Fata tries to hold Raytheon and RECI responsible for payment of his severance pay under Raytheon's and RECI's stock purchase agreement with MK.

### 1. Step One

Section 502(a)(1)(B) of ERISA establishes a cause of action under ERISA. It provides, in relevant part, that:

A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the

Henceforth, any discussion of severance pay will include any applicable vacation pay.

terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

To bring an action under § 502(a)(1)(B), the person bringing the action must be a participant or beneficiary of the plan and the action must be brought to enforce the participant's rights due under the plan. There is no controversy that La Fata was a participant of RE & C's Severance Pay Policy. The RE & C Severance Pay Policy is an employee welfare benefit plan under ERISA. *La Fata v. Raytheon Co.,* 223 F.Supp.2d 668, 676 (E.D.Pa.2002). Under La Fata's reasoning, he has an action under § 502(a)(1)(B) of ERISA against RE & C or Washington Group under the terms of the Severance Pay Policy [19] for severance pay when Raytheon and RECI sold its stock of RE & C to MK.

■ A claim for benefits under ERISA § 502(a)(1)(B) is an assertion of a contractual right under the terms of plan. *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.,* 334 F.3d 365, 381 (3d Cir. 2003). The written terms of the plan documents are controlling. *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 58 F.3d 896, 902 (3d Cir.1995). When considering claims under § 502(a)(1)(B), the plan is interpreted under principles of contract law. *Kemmerer v. ICI Ams.,* 70 F.3d 281, 288 (3d Cir.1995). Those principles require that a court first look to the plain language of the document. If that language is clear, courts must not look to

other evidence. *Bill Gray Enters. v. Gourley,* 248 F.3d 206, 218 (3d Cir.2001). Extrinsic evidence may be used, however, to aid in the interpretation of ambiguous plan provisions although it may not be used "to create an ambiguity where none exists." *Gritzer v. CBS, Inc.,* 275 F.3d 291, 298 (3d Cir.2002) (*quoting Int'l Union v. Skinner Engine Co.,* 188 F.3d 130, 145 (3d Cir.1999)). Third Circuit law and the *Restatement of Contracts* construes any ambiguities in a contract against the drafter. *In re F.H. McGraw & Co.,* 473 F.2d 465, 468 (3d Cir.1973); *Restatement (Second) of Contracts* § 206 (1981).

The Severance Pay Policy, as incorporated into Section X of the Termination of Employment Policy, and the ERISA plan under which La Fata is claiming benefits, provides:

> Severance pay will be authorized for those terminations of full-time employees classified as layoff, release, or reorganization, and will be based upon length of service as of the employee's physical release date (only completed years of service will be used to determine entitlement).[20]

Section IV of the Termination of Employment Policy defines the events qualifying one for severance:

> Layoff is an involuntary termination of employment with the Company, when, because of economic or organizational reasons, a reduction in work forces is required.

---

**19.** The Severance Pay Policy is Section X of the RE & C Termination of Employment Policy. Section IX of the RE & C Termination of Employment Policy indicates the timing of when severance benefits will be paid out to employees. The RE & C Termination of Employment Policy is the policy created by RE & C to establish fair and uniform standards for termination of employees.

**20.** Section IX of the Termination of Employment Policy is also relevant. It reads:

> "Any accrued vacation and severance pay, if applicable, will be included on the first paycheck following an employee's termination date."

Release is an involuntary termination of employment with the company when it is determined that an employee cannot, through no fault of their own, perform the work assigned.

Reorganization is an involuntary termination of employment due to a change in Company structure.

As required under ERISA jurisprudence, the terms of the policy must be interpreted. Under the terms of the Severance Pay Policy, La Fata must have experienced a termination before he is entitled to severance pay. Therefore, the operative term in deciding whether a participant in this plan qualifies for severance benefits is whether the participant experienced a "termination." In construing the plan, the question thus becomes what constitutes a termination.

Neither the Severance Pay Policy nor the Termination Policy defines the word "termination," as used in the Severance Pay Policy, or the phrase "termination of employment," as used in Section IV of the Termination of Employment Policy. Nor is the meaning of either term clear from the plain language of the plan. Therefore, the term "termination" and the phrase "termination of employment" are ambiguous. Because the terms are ambiguous, under the law of interpretation of a plan, a court then looks outside the four corners of the document to ascertain the meaning of the relevant terms.

*Black's Law Dictionary* defines the exact term used in Section IV of the Termination of Employment Policy. *Black's Law Dictionary* 1471 (6th ed.1990) defines "termination of employment" as " . . . a complete severance of relationship of employer and employee." [21] This definition of termination of employment has been used by other courts when the plan at issue failed to define that term.[22] *See, e.g., Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 405 (11th Cir.1989). *But cf. Barnett v. Petro–Tex Chem. Corp.,* 893 F.2d 800, 809–810 (5th Cir.1990) (Texas courts in diversity have applied the "complete severance of relationship between employer-employee relationship" definition of termination of employment to insurance contracts, but it is unclear if that definition is applicable to an employment contract).

Although the Third Circuit has not defined the phrase "termination of employment" in the context of entitlement to severance pay, there is relevant Third Circuit law on when an employee is entitled to severance pay. The Third Circuit does not require severance pay to be conditioned upon unemployment. The Third Circuit has noted that while severance pay is primarily intended to compensate employees for losses they incur because they have no job, this "does not necessarily mean that severance pay can be due only when em-

**21.** The unedited definition is "[w]ithin policies providing that insurance should cease immediately upon termination of employment, means a complete severance of relationship of employer and employee." *Black's Law Dictionary* 1471 (6th ed.1990).

**22.** When the relevant statute failed to define the term "employment termination," the Third Circuit defined the word "terminate" in an employment context as: "To discontinue the employment of." *Moore v. Warehouse Club,* 992 F.2d 27, 29 (3d Cir.1993) (*citing American Heritage Dictionary,* 2nd Edition

1254 (1982)). *Black's Law* Definition of "termination" is used in this opinion as opposed to the Third Circuit's definition in *Moore* of "terminate" because the Severance Pay Policy and the Termination of Employment Policy use the noun "termination." The difference between the noun "termination" and the verb "terminate" is material in the instant case because a verb implies that an actor and an object is required, whereas a noun does not. *Moore's* definition of the verb "terminate" is less applicable.

ployees are unemployed." *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 146–47 (3d Cir.1987) (*rev'd on other grounds*). The Third Circuit has held that when a person's employment situation materially changes, "severance pay benefits may be intended to compensate an employee for the possibility of lower salary and benefits even when his or her employment continues without interruption with a new employer." *Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1171 (3d Cir.1992). For example, the Third Circuit found that severance benefits may be triggered by a significant reduction in employee benefits occurring in connection with the sale of a division. *See Ulmer v. Harsco Corp.*, 884 F.2d 98, 103 (3d Cir.1989). The reasoning of *Ulmer* has been extended by a court in this district to apply to a sale of the entire assets of a wholly-owned subsidiary. *See Chacosky v. Hay*, 1991 WL 12170, at *6 (E.D.Pa. Feb.1, 1991). The issue thus becomes whether the facts alleged by La Fata suggest sufficient evidence of a complete severance of the em-

ployer-employee relationship to survive a motion for summary judgment.

■ There are at least five reasons a factfinder could conclude that La Fata's relationship with his employer, RE & C, were completely severed on the day of the stock sale. For one, the July 7, 2000 Q & A sheet referenced "former RE & C employees" as opposed to "RE & C employees." It does not seem plausible that employees who were still working for the same employer would be referred to as "former" employees. Secondly, the stock options report prepared by Raytheon for La Fata listed the reason for the cancellation of stock options on July 7 as "terminated." Thirdly, the Stock Purchase Agreement states that the employment of RE & C employees by MK [23] will be deemed to have commenced on the day of the close.[24] Also, the MK/WG 401(k) plan, calculated July 7, 2000 as the last day of employment with RE & C. Finally, La Fata claims, and is able to support that claim with evidence, that RE & C was merged out of existence on July 7.[25] If an

---

**23.** The Agreement also contemplates that MK will cause an RECI company to offer employment to the employees.

**24.** The exact language of § 9.1(a) reads:

At the Closing, the Buyer will or will cause an RECI Company to offer employment to those individuals listed on Schedule 9.1, each an employee of one or another of the Sellers primarily engaged in providing services with respect to the Purchased Business. The offer for each such individual shall be for the same base pay as such individual receives as of the Closing Date and with benefits satisfying the Buyer's obligations under Section 9.2. The employment with the Buyer (or an RECI Company) of all such employees accepting such offers will be deemed to have commenced immediately after 11:59 p.m., Boston local time, on the Closing Date.

**25.** When analyzing whether La Fata was terminated, both parties focus a great deal on

when the legal existence of RE & C was extinguished. La Fata argues that RE & C was merged out of existence on the day of the stock sale. Defendants, arguing that La Fata worked for RE & C until he resigned (Mem. Supp. D's Mot. Summ. J. § 27), do not concede that RE & C was merged out of existence, but do argue that the merger was not effective until July 10, 2000. Defendants' position is unpersuasive. The Delaware Secretary of State certified that the Certificate of Ownership and Merger was filed on July 10, 2000, not that the merger happened on July 10. In fact, the text of the Delaware Certificate suggests that the merger happened prior to July 10. Initially, the Delaware Certificate merges RE & C into Washington Group, an Ohio Corporation. According to the Ohio Secretary of State, Washington Group was the new name of the organization that survived after RE & C merged into MK on July 7, 2000. The representation to the Delaware Secretary of State thus depended on Washington Group being an already existing company

employer no longer exists, the relationship that employer had with its former employees would be completely severed.

The above facts suggest that La Fata's employment relationship with RE & C may well have ended on the day of the stock sale despite La Fata's uninterrupted employment because a termination of employment does not require the absence of employment, only the severance of the relationship between the employee and the employer. This is consistent with Third Circuit law [26] holding that an employee can be entitled to severance pay even if the employee faced no interruption in employment. I therefore find that La Fata could have experienced a termination of employment on the day of the stock sale within the meaning of the Termination Policy.

In addition to experiencing a termination, La Fata must establish that the circumstances of his termination constituted an event qualifying for severance under the Severance Pay Policy. The applicable

language of the Termination of Employment Policy reads as follows:

> Layoff is an involuntary termination of employment with the Company, when, because of economic or organizational reasons, a reduction in work forces is required.

> Release is an involuntary termination of employment with the company when it is determined that an employee cannot, through no fault of their own, perform the work assigned.

> Reorganization is an involuntary termination of employment due to a change in Company structure.

Under the terms of the Severance Pay Policy, the termination must constitute a layoff, release, or reorganization as defined by the Termination Policy in order to qualify a participant for benefits. To this effect, La Fata argues that his termination could be classified [27] as either a reorganization or a lay-off under the definitions provided by the Termination Policy.

According to the Termination Policy:

---

prior to the filing on July 10. Additionally, the Certificate included a copy of the resolutions passed by Washington Group's Board of Directors on July 7, 2000, the first of which merged RE & C into Washington Group. La Fata is correct that the employee-employer relationship becomes severed when an employer becomes non-existent. However, a relationship can be proven to be severed upon a showing of a lot less. For that reason, it is not necessary to establish conclusively when RE & C ceased to legally exist.

**26.** I need not decide whether *Ulmer* extends to a sale of stock or if the benefit reduction in the instant case was significant enough to warrant severance benefits under *Ulmer* because it is not material to my reasoning.

**27.** The Termination Policy does not specify who classifies the involuntary termination as one of the qualifying events. The Termination Policy does not contain any administrative procedures at all. The Welfare Benefit Plan, the umbrella-plan, however, does pro-

vide an administrative procedure for all the Constituent Benefit programs, one of which is the Severance Pay Policy. The relevant provision of the Welfare Benefit Plan reads:

> The Plan Administrator shall have absolute discretion to construe and interpret any and all provisions of the Plan and the Constituent Benefit Programs, including, but not limited to, the discretion to resolve ambiguities, inconsistencies, or omissions conclusively; provided, however, that all such discretionary interpretations and decisions shall be applied in a uniform and nondiscriminatory manner to all Participants and Covered Eligible Dependents similarly situated.

App. Supp. D's Mot. Summ. J. Ex. C at § 6.2. The text of the Welfare Benefit Plan suggests that the Plan Administrator has the sole discretion to determine whether or not the employment action was an event qualifying for severance. The remaining defendants have not challenged La Fata's claim to benefits on procedural grounds, thus this issue need not be addressed.

Layoff is an involuntary termination of employment with the Company, when, because of economic or organizational reasons, a reduction in work forces is required.

For an employment action to be classified as a lay-off, a reduction in force is necessary. La Fata's employment continued after the stock sale. His continued employment is evidence that he was not the victim of a reduction in force. Thus, La Fata could not be said to have experienced a lay-off as a result of the stock sale.

According to the Termination Policy:

Reorganization is an involuntary termination of employment due to a change in Company structure.

The definition does not specify the degree to which the company structure must change in order to qualify as a reorganization.

On the day of the stock sale, MK acquired RE & C, merged RE & C into MK, and changed the name of the surviving entity. An undated document entitled the "MK & RE & C Weekly Connection" called the integration of RE & C into MK a "reorganization." The organization for which La Fata worked prior to July 7, 2000 had eight operating divisions. The organization employing La Fata after July 7, 2000 had five operating divisions. Only one of those divisions maintained the same division head before and after the stock sale. The merging of RE & C into MK, the change in the number of operating divisions, and the change in management structure constitutes "a change in Company structure." This evidence is sufficient to say that a reorganization may have triggered the termination.[28]

As La Fata has presented facts supporting that he experienced a termination of employment and that RE & C underwent a reorganization under the terms of the Termination Policy on the day the stock sale closed, I find that La Fata may have been entitled to severance benefits under the Severance Pay Policy.

## 2. Step 2

If La Fata is able to convince the finder of fact that he is entitled to severance pay pursuant to the Severance Pay Policy, he must then establish that he has a right to collect from Raytheon and RECI. Both parties agree that Raytheon and RECI would not be responsible to La Fata for these payments absent the Stock Purchase Agreement. La Fata argues that he and the class are third-party beneficiaries of the Stock Purchase Agreement and are

---

**28.** Defendants correctly point out that the Welfare Benefit Plan, the umbrella plan, contains a provision calling for its own termination, and presumably also the termination of the Constituent Benefit Programs specifically incorporated, in the event of a dissolution, merger, consolidation, or reorganization of RE & C if RE & C is not the survivor. Defendants argue that if there were in fact a reorganization, then the Welfare Benefit Plan and all its incorporated programs are extinguished, leaving La Fata and the class no entitlement under which to sue. However, the Welfare Benefit Plan also states that the provisions of an Incorporated Plan trump the Welfare Benefit Plan in the event that any terms between the two are contradictory.

The Severance Pay Policy is an Incorporated Plan. As the Severance Pay Policy specifically instructs the authorization of severance pay in the event of a reorganization, the Severance Pay Policy presumes its own survival in the event of a reorganization. The language of the Severance Pay Policy thus controls this contradiction with the Welfare Benefit Plan. Furthermore, the Defendants themselves maintain that the Severance Pay Policy was not terminated until August 25, 2001. Finally, if the Welfare Benefit Plan and all its Incorporated Plans were in fact extinguished on the day of the stock sale, then La Fata would have a much stronger argument that he was entitled to severance pay under *Ulmer* due to a material reduction in benefits.

thus entitled to payment under the Agreement.

New York law applies to the construction of the Agreement.[29] Under New York law, third-parties to a contract may enforce promises made for their benefit. *Banco Espirito Santo De Investimento, S.A. v. Citibanc, N.A.*, 2003 WL 23018888, *8, 2003 U.S. Dist. LEXIS 23062, at *24 (S.D.N.Y. Dec. 29, 2003). A party asserting rights as a third-party beneficiary must establish "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *California Pub. Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S.2d 256, 741 N.E.2d 101, 104 (2000) (*quoting Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459, 469 (1983)). New York law also provides, however, that when a provision in the contract expressly negates enforcement by third parties, that provision is controlling. *Morse/Diesel, Inc. v. Trinity Industries, Inc.*, 859 F.2d 242, 249 (2d Cir.1988); *Edward B. Fitzpatrick, Jr. Constr. Corp. v. County of Suffolk*, 138 A.D.2d 446, 525 N.Y.S.2d 863, 866 (N.Y.App.Div.1988). "If two contracting parties expressly provide that some third party who will be benefitted by performance shall have no legally enforceable right, the courts should effectuate the express intent by denying the third party any direct remedy." 4 Corbin on Contracts, § 777 at 25 (1951); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F.Supp. 712, 733 (S.D.N.Y.1989) (citing 4 Corbin on Contracts § 777 favorably).

New York law follows the basic rule of contract interpretation that where the terms of a written agreement are unambiguous, the intent of the parties must be gleaned from the contract language. *Travelers Indem. Co. v. 28 E. 70th St. Constr. Co.*, 296 F.Supp.2d 476, 481 (S.D.N.Y.2003). If a contract is unambiguous, its provisions are to be construed by a court. *Morse/Diesel, Inc. v. Trinity Indus.*, 67 F.3d 435, 439 (2d Cir.1995). If a contract contains ambiguous language, but the issue can be resolved on the basis of the contract alone, without reference to extrinsic evidence, the issue is to be determined by the courts as a matter of law. *W.A. Olson Enter., Inc. v. Agway, Inc.*, 55 N.Y.2d 659, 446 N.Y.S.2d 928, 431 N.E.2d 289 (1981). The meaning of an ambiguous contract, however, is a question of fact. *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir.2001). The issue of whether or not a contract is ambiguous is a question of law to be determined by the court. *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir.2003).

Sections 9.1(c) and 9.3(d) of the Stock Purchase Agreement provide:

9.1(c) The Sellers shall remain responsible for any severance benefits, termination indemnity payments, or similar payments, if owed to any individual made an offer of employment as provided in paragraph (a) above who does not accept such offer.

9.3(d) The Sellers shall be responsible for amounts payable and any other obligations under the Retention Agreements not specifically addressed in this Section 9.3, when and if such obligations become due, and for severance, change of control or similar amounts payable to any Assumed Employees and arising solely

---

**29.** *See* § 16.4 of the Agreement.

from the consummation of the transactions contemplated by this Agreement.

Section 16.9 of the Agreement provides:

> Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any person, firm or corporation, except the Sellers and the Buyer and as provided in Article 13 [30] with respect to the Buyer Indemnified Parties [31] and the Seller Indemnified Parties,[32] any rights or remedies under or by reason of this Agreement.

As a threshold matter, I must determine as a matter of law if Section 16.9 is ambiguous. In *Morse/Diesel, Inc. v. Trinity Indus.*, the Second Circuit considered a subcontract section that provided:

> Except as otherwise provided herein, no provision of this Agreement shall in any way inure to the benefit of any third person (including the public at large) so as to constitute any such person a third party beneficiary of this Agreement or any one or more of the terms hereof or otherwise give rise to any cause of action in any person not a party hereto.

In interpreting New York law, the court held that the explicit negation of third party beneficiary obligations in the subcontract was controlling. *India.com, Inc. v. Dalal*, 2003 WL 22093475, **2–3, 2003 U.S. Dist. LEXIS 15660 (S.D.N.Y. Sep. 10, 2003), involved an agreement concerning the creation of rights to a commission upon the sale of a business. The agreement expressly provided it was not intended to create any third party rights. The relevant provision negating third party rights provided:

> Neither this Agreement or any provision hereof nor any Schedule, exhibit, certificate or other instrument delivered pursuant hereto, nor any agreement to be entered into pursuant hereto or any provision hereof, is intended to create any right, claim or remedy in favor of any person or entity, other than the parties hereto and their respective successors and permitted assigns and any other parties indemnified under Article XI.

The court held that the language of the negating clause was clear and explicit and that under New York law, that provision expressly negated the creation of any rights for third party beneficiaries. *India.com, Inc. v. Dalal*, 2003 WL 22093475, **2–3, 2003 U.S. Dist. LEXIS 2305, at * 7–*8 (S.D.N.Y. Feb. 21, 2003).

▮▮ Section 16.9 of the Raytheon/RECIMK Stock Purchase Agreement is less ambiguous about its intent to deny third party beneficiary rights than either of the provisions considered by the New York federal courts. Section 16.9 is more specific about who exactly is an intended beneficiary and more exhaustive in its list as to who or what cannot be deemed an intended beneficiary. Section 16.9 requires that intended beneficiaries be "expressly provided herein" as opposed to

---

**30.** Article 13 of the Stock Purchase Agreement describes the circumstances in which the Buyer and the Seller have indemnified each other and agreed to hold the other harmless from and with respect to claims made against them. The circumstances of indemnification differ for both the Buyer and the Seller.

**31.** Section 13.1 of the Agreement defines the "Buyer Indemnified Parties" as the "Buyer, its Subsidiaries and Affiliates (and each of their respective directors, officers, shareholders, agents, and employees)."

**32.** Section 13.2 of the Agreement defines the "Seller Indemnified Parties" as "each Seller and their Subsidiaries and Affiliates (and each of their respective directors, officers, shareholders, agents, and employees)."

simply "provided herein" and specifically denies the possibility of "implicit" intended beneficiaries. Under New York law, section 16.9 is clear and unambiguous. Section 16.9 of the Stock Purchase Agreement expressly negates any third-party claims.

Because § 16.9 controls, La Fata can only meet his burden of demonstrating that he is an intended beneficiary if the Agreement expressly provides that he is. The Agreement does not so provide. Neither of the provisions obligating Raytheon to pay any severance owed expressly makes La Fata or the class intended beneficiaries of the Stock Purchase Agreement. Nor are employees expressly designated as intended beneficiaries in the provision of the Agreement obligating MK either to offer employment or to cause an RECI Company to offer employment to certain employees.[33] La Fata offers an affidavit from the General Counsel of Washington Group stating: "It was the WG's [Washington Group] intent and understanding that Raytheon Company's obligations to RE & C employees under Art. 9.3(d) were within the exception stated in Art. 16.9. WG is not aware of any contrary intent on the part of Raytheon." This evidence is not admissible because the language of the Agreement is unambiguous. Even if it were admissible, this evidence implies at best that employees may have been intended beneficiaries of the Stock Purchase Agreement. A mere suggestion of intent is insufficient to constitute an express provision as required. La Fata may have incidentally benefitted from the Stock Pur-

chase Agreement, but not every contract that benefits third persons affords enforceable rights in such persons. *See Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 603 n. 24, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). La Fata fails to demonstrate that he has any third party rights to enforce.

Because the contractual language of the Agreement prohibiting third party enforcement is not subject to more than one reasonable interpretation, summary judgment for the defendants on Count I is appropriate.

## B. Count II

La Fata claims that Raytheon and RECI violated § 510 of ERISA by attempting to structure the sale of RE & C to MK in a way that would avoid incurring the liabilities of the Severance Pay Policy. Section 510 provides, in relevant part, that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a [plan] participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan], this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.

The primary purpose of § 510 is to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested

---

**33.** Section 9.1(a) of the Stock Purchase Agreement provides that:

> At the Closing, the Buyer will or will cause an RECI Company to offer employment to those individuals listed on Schedule 9.1, each an employee of one or another of the Sellers primarily engaged in providing services with respect to the Purchased Business. The offer for each such individual

shall be for the same base pay as such individual receives as of the Closing Date and with benefits satisfying the Buyer's obligations under Section 9.2. The employment with the Buyer (or an RECI Company) of all such employees accepting such offers will be deemed to have commenced immediately after 11:59 p.m., Boston local time, on the Closing Date.

pension benefits." *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 851 (3d Cir.1987). All Raytheon and RECI did was to sell stock. Raytheon and RECI were not acting as an unscrupulous employer of RE & C employees; at no time were they ever acting as an employer of La Fata at all.

In order to prevail on this claim, a plaintiff must prove that the (1) defendant took a proscribed employment action (2) for the purpose of interfering[34] with (3) the attainment of any right to which the plaintiff may become entitled under ERISA.

As a first step, La Fata must prove that the defendants took a proscribed employment action. The proscribed employment actions as set out in the statute are: discharging, fining, suspending, expelling, disciplining, or discriminating against a plan participant.

Clearly Raytheon and RECI have not discharged,[35] fined, suspended, expelled, or disciplined plaintiff, La Fata. Therefore,

the only proscribed employment action arguably committed by the defendants is that they discriminated against La Fata.

Black's Law Dictionary 467 (6th ed.1990) defines "discrimination" as:

... the effect of a statute or established practice which confers particular privileges on a class arbitrarily selected from a large number of persons, all of whom stand in the same relation to the privileges granted and between whom and those not favored no reasonable distinction can be found.

Although the prohibited act of discrimination may be capable of broad interpretation, *see Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan,* 24 F.3d 1491, 1503 (3d Cir.1994), the Third Circuit has consistently agreed that in this context, "discrimination" must be limited to actions affecting the employer-employee relationship. *See Fischer v. Philadelphia*

---

**34.** Third Circuit case law recognizes that it might be difficult to prove that the defendant had the requisite specific intent to violate § 510. *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3d Cir.1987) (in most cases, "smoking gun" evidence of specific intent does not exist). To this end, the Third Circuit allows plaintiffs to use both direct and circumstantial evidence to establish specific intent. *DiFederico v. Rolm Co.*, 201 F.3d 200, 204–05 (3d Cir.2000). However, if the plaintiff offers no direct evidence as to the specific intent of the defendant, and relies solely on circumstantial evidence, the court analyzes the claim in accordance with a three-part burden-shifting framework. The first part of the framework is a prima facie test. The Third Circuit formulates the prima facie test as: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Gavalik*, 812 F.2d at 852. If the plaintiff can make out a prima facie test, "the burden of production shifts to the employer to introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged actions." *Id.* at 853. If the employer has

satisfied its burden, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's proffered reason was pre-textual. *Eichorn v. AT & T Corp.*, 248 F.3d 131, 150 (3d Cir.2001). To survive summary judgment when the defendant articulates a legitimate reason for the conduct at issue, the plaintiff must provide evidence, direct or circumstantial, from which a factfinder could disbelieve the legitimate reasons articulated by the employer for the conduct. *See Kowalski v. L & F Prods.*, 82 F.3d 1283, 1289 (3d Cir.1996).

**35.** Finding that La Fata experienced a termination in Count I does not mean that he experienced a "discharge" actionable under § 510. The Employment Termination Policy defines discharge as a type of involuntary termination, but not all involuntary terminations are discharges. In fact, the Termination Policy specifically precludes a discharged employee from receiving severance. Therefore, had he been discharged he would not be entitled to severance and thus would not be able to satisfy a required element of the statute.

*Elec. Co.*, 96 F.3d 1533, 1543 (3d Cir.1996); *Haberern*, 24 F.3d at 1503.

In *Haberern*, the defendant corporation amended its life insurance benefits such that one employee's benefits were eliminated, but the other two employees' life insurance benefits were tripled. The Third Circuit concluded that this was not discrimination under § 510 because the amendments did not affect the employer-employee relationship. *Haberern*, 24 F.3d at 1502–04. In *Becker v. Mack Trucks, Inc.*, the employer laid off a number of its employees because it was closing some facilities. 281 F.3d 372 (3d Cir. 2002). When the employer needed to hire new employees ten years later, it declined to rehire its laid-off workers because to do so would create future pension liabilities greater than those incurred from hiring employees with no previous service with the employer. The Third Circuit was unwilling to characterize the employer's failure to rehire as discrimination under § 510. In *Fischer v. Philadelphia Elec. Co.*, the employer announced to all its employees that it was creating an early retirement program. 96 F.3d 1533. Plaintiffs alleged that prior to the announcement, employees made inquiries as to whether the employer was considering the implementation of an early retirement plan. Plaintiffs claimed that the employer denied, or failed to disclose when asked, that it was seriously considering an early retirement program. After the early retirement program was implemented, employees who had retired prior to the announcement brought suit. The *Fischer* Court held that there was no discrimination at the time the plaintiffs retired because the class members were treated no differently from any other workers. *Fischer*, 96 F.3d at 1543.

In *Blaw Knox Ret. Income Plan v. White Consol. Indus.*, White Consolidated Industries sold a group of its unprofitable divisions and their associated underfunded pension plans to the Blaw Knox Corporation. 998 F.2d 1185 (3d Cir.1993). The Plaintiffs claimed that at the time the sale was negotiated, the Blaw Knox Corporation, the buyer of the divisions, was unable to make the contributions due under ERISA's minimum funding requirements and was unlikely to be able to make the required plan payments in the future. Plaintiffs further claimed that Washington Consolidated Industries' principal purpose behind selling those divisions was to avoid liability for the underfunded pension plans. Plaintiffs brought suit under a number of ERISA provisions, including § 510. The Third Circuit first held that selling an ongoing business cannot constitute a prohibited act under § 510. The Third Circuit further held that the sale did not result in discrimination under § 510 because the sale of the divisions and the transfer of the plans did not affect the participants' eligibility for benefits or rights under the plans. The Third Circuit concluded that while there was a change in employers, which meant that the sponsorship of the plans changed, there was no discrimination because the employees who participated in the plans prior to the sale continued their participation immediately after the sale. *Blaw Knox*, 998 F.2d at 1191.

In the recent decision *Eichorn v. AT & T Corp*, the Third Circuit allowed a § 510 action to go forward in the context of a sale of a division when the members of the class were treated differently and there was arguably intent to interfere with an entitlement under ERISA. 248 F.3d 131 (3d Cir.2001). AT & T decided to sell Paradyne Corp., one of its affiliates. Under the AT & T pension plan in effect at the time of the sale, employees were granted "bridging rights." These bridging rights permitted employees to retain their

level of accrued pension benefits if they left AT & T but returned within six months. To make Paradyne more attractive to potential buyers, AT & T adopted a human resource program that restricted the ability of Paradyne's employees to transfer to other divisions of AT & T. Prior to Paradyne's sale, AT & T transferred the ownership of Paradyne to Lucent Technologies, another one of AT & T's affiliates. Lucent then sold Paradyn to Texas Pacific Group. Once the sale closed, Lucent agreed on behalf of itself and other AT & T affiliates that for eight months following the sale no AT & T affiliate would seek to hire, solicit, or rehire any Paradyne employee or consultant whose compensation exceeded $50,000. Because the no-hire agreement prohibited Paradyne employees from returning to an AT & T affiliate within eight months, it precluded Paradyne employees, and only Paradyne employees, from exercising their bridging rights. This no-hire agreement had the effect of cancelling the accrued pension benefits of Paradyne's employees under their former AT & T pension plans. Former Paradyne employees brought suit under § 510. The *Eichorn* Court focused solely on whether or not the defendants had the requisite specific intent. The *Eic-*

*horn* Court reversed the District Court's opinion granting summary judgment for the defendants. By reversing the District Court's opinion, the *Eichorn* Court implicitly said that AT & T's conduct constituted actionable discrimination under § 510.[36]

Underlying these Third Circuit decisions is that for discrimination to be present under § 510, one worker or class of workers must receive better treatment than another. Treating employee classes differently, however, is not sufficient to establish discrimination under § 510. The differentiation among the classes of workers must also affect the employer-employee relationship.

■ The defendants in the instant case did not deprive one class of employees benefits that another class of employees received. All Raytheon and RECI did was to sell the stock they held in RE & C. The Third Circuit has held that the act of selling an ongoing business in and of itself, does not violate § 510. *Blaw Knox*, 998 F.2d at 1191. The sale of RE & C stock by Raytheon and RECI did not constitute discrimination because it affected all RE & C employees. No class of RE & C employees were singled out by Raytheon or RECI for differential treatment.[37] Be-

36. In the case before us, there is no doubt that La Fata presented sufficient evidence that Raytheon and RECI sold stock instead of assets to avoid paying severance pay. There is ample evidence that the initial proposal between Raytheon and MK was structured as an asset sale and that it was Raytheon and RECI that later proposed structuring the sale as a sale of stock. This evidence includes testimony from various witnesses, the Term Sheet outlining the transaction as an asset purchase, and an early draft of the agreement of sale entitled a "Stock and Asset Purchase Agreement." There is also testimony that members of Raytheon's Human Resources Leadership Team discussed structuring the sale as a stock sale as opposed to an asset sale because a stock sale was believed not to trigger the obligations of the RE & C Severance

Pay Plan. Finally, there is the letter from the Washington Group Human Resources Manager denying severance benefits because the stock sale was a change of ownership and not a change of employment.

37. Some RE & C employees may have received severance for their termination and others did not. However, the facts do not indicate that Raytheon and RECI determined who would receive severance and who would not. They were merely responsible to the buyer for any severance paid. While some former RE & C employees may have arguably experienced discrimination by not receiving severance, Raytheon and RECI did not commit that discrimination. Similarly, some former RE & C employees may have commenced

cause selling stock is not discrimination nor any other prohibited conduct under § 510, La Fata cannot prevail. Because La Fata has failed to demonstrate that selling RE & C stock is prohibited conduct under § 510, I grant defendants' motion for summary judgment on Count II. Because defendants' motion for summary judgment has been granted, the plaintiff's cross motion for summary judgment is denied as moot.

employment with Washington Group on the day of the stock sale while others did not. Again, the facts do not indicate that Raytheon and RECI made that determination. Therefore, Raytheon and RECI did not engage in any discrimination that may have occurred in the rehiring process.